**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSEPHINA DOMINGUEZ, | : | |
|     Plaintiff, | : | |
| | : | **CIVIL ACTION NO.** |
|     v. | : | **3:11-CV-01096 (VLB)** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
|     Defendant. | : | **August 9, 2013** |

<u>**MEMORANDUM OF DECISION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #48] AND DISMISSING CASE FOR LACK OF SUBJECT MATTER JURISDICTION**</u>

I.    <u>**Introduction**</u>

The Plaintiff, Josephina Dominguez ("Dominguez"), brings this negligence action grounded in premises liability for monetary relief against the Defendant United States of America ("United States") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b), in recompense for injuries she sustained when she allegedly slipped and fell on snow and/or ice which had accumulated in an outdoor walkway area at the Federal Correctional Institution in Danbury, CT. Currently pending before the Court is the Defendant's Motion for Summary Judgment. For the reasons that follow, the Defendant's Motion for Summary Judgment is DENIED, and this case is DISMISSED without prejudice for lack of subject matter jurisdiction.

II.    <u>**Factual Background**</u>

As an initial matter, the Court notes that both the Defendant's and the Plaintiff's recitations of facts in the Motion for Summary Judgment and the opposition at times do not comport with the evidence to which the parties cite, and the same is true for the parties' Local Rule 56 statements.  Where a party has failed to support an asserted fact with evidence from the record, the Court will not consider the assertion to be fact.  D. Conn. L. Civ. R. 56(a)3 (each statement of material fact in a Local Rule 56(a)1 or Local Rule 56(a)2 statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)2 statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial.").

The following facts relevant to the Defendant's Motion for Summary Judgment are undisputed unless otherwise noted.  The Defendant United States operates a Federal Correctional Institution in Danbury, CT ("FCI Danbury").  The Plaintiff, Josephina Dominguez, has been an inmate at FCI Danbury since February 27, 2006.  [Dkt. 48-2, D's 56(a)1 Stmnt. ¶¶ 1, 2].  Since August 2006 Dominguez has worked for UNICOR, which is located on FCI Danbury's property, five days per week.  [Dkt. 48-2, D's 56(a)1 Stmnt. ¶¶ 4, 5].  Ms. Dominguez has estimated that approximately 100 inmates worked at UNICOR, all of whom walk to work together each day.  [Dkt. 52-1, Dominguez Depo. p.13 (4/8)].  According to Bruce MacGregor, the Facility Manager for FCI Danbury, approximately 500 inmates walk around 7:30 each workday morning to UNICOR and to a second employer through the rear gate area where Ms. Dominguez fell.  [Dkt. 52-2, MacGregor Depo. pp. 43, 46-47 (11, 14-15 / 21)].

On January 8, 2010[1] at approximately 7:30 a.m. Ms. Dominguez alleges that while walking to work on the travel route designated by the Defendant, she slipped and fell on an accumulation of ice and snow which had covered an outdoor walkway, causing fractures in the bones of her left hand with non-union healing.  [Dkt. 1, Compl. ¶¶6, 10].  Dominguez testified as to the weather conditions on the day of her fall as follows:

> Oh, that day, the weather, it was snowing.  It had been snowing hard for a number of days. . . . Yes, [it was actually snowing when I fell] because I was there for a while.  I couldn't even get up [from the ground] because this bone was over here.  And by the time they got me up, I had snow all over my head because it was snowing out.  It was snowing heavily.

[Dkt. 52-1, Dominguez Depo. p.16 (5/8)].  As to her fall, she testified: "I don't know [how I fell].  I was just walking along, and before I knew it, I had fallen because in that patch it was icy.  There was ice there.  It wasn't just snow."  [Dkt. 52-1, Dominguez Depo. p.16 (5/8); Dkt. 48-2, D's 56(a)1 Stmnt. ¶11].  Ms. Dominguez recalled that when she fell there were people to her front, to her back, to her right and to her left, all walking together to work.  [Dkt. 52-1, Dominguez Depo. p.17 (6/8)].  When asked whether anyone in the group talked about the condition of the pavement on the morning of her fall, Ms. Dominguez responded

---

[1]     Although the Plaintiff alleged in her Complaint that this incident happened on January 7, 2010, *see* Dkt. 1, Compl. ¶6, the parties now agree that this event took place on January 8, 2010.  [Dkt. 48-1, D's MSJ p.2, p.2 n.1; Dkt. 38, Trial Memo (submitted to the Court prior to the filing of Defendant's Motion for Summary Judgment), Stipulations of Fact, p.21 ¶ 2].

> **Yes.  Everyone was talking about the fact that it hadn't been cleared.  It was slippery.  All of the others were saying, Oh, you know, look, it's slippery, there is a lot of ice, it hasn't been cleared. . . . No, [the pavement] wasn't cleared.  And it was - - it had been snowing for days. Days.**

[Dkt. 52-1, Dominguez Depo. pp.17-18 (6-7/8)].  Dominguez recalled that she saw "quite a bit of ice" on the pavement but did not recall whether there was also snow on the ground.  [Dkt. 52-1, Dominguez Depo. p.18 (7/8)].  No other slip and fall accidents were reported on January 8, 2010 in the area where Ms. Dominguez fell.  [Dkt. 48-2, D's 56(a)1 Stmnt. ¶6; Dkt. 52, P's 56(a)2 Stmnt. ¶6; Dkt. 48-12, MacGregor Depo. p. 94].

Both parties have submitted a National Weather Service "Record of River and Climatological Observations" for Danbury, CT for the month of January, 2010 ("Weather Record"), which indicates precipitation levels for each day of the month.[2]  [Dkt. 48-10, Weather Record].  It appears, however, that both parties have

---

[2]    This Record has been filled out on WS FORM B-91.  Neither of the parties has provided to the Court instructions as to how this form was completed or by whom, nor has either party provided an explanation either of how to read the notations made in each column or how to interpret the columns' headers.  As such, the Court notes that the National Weather Service has published "Instructions for WS Form B-91" (last modified Nov. 21, 2006) on its government website, and it is to these instructions the Court looks for assistance in reading this Record.  *See* http://www.nws.noaa.gov/om/coop/forms/b91-notes.htm.   The Court also notes that these instructions report that "the B-91 Form is the monthly summary form used by NWS [National Weather Service] Coop Observers to record their observations."  The NWS's website reveals that the Cooperative Observer Program is a program by which a network of 11,000 civilian volunteers report to the NWS their climatological observations taken at cooperative stations. The program was formally created in 1890 under the Organic Act.  *See* http://www.nws.noaa.gov/om/coop/what-is-coop.html.  The parties have not

incorrectly read the data contained in this Weather Record.  As such, the Court looks directly to the Weather Record data rather than to the parties' characterizations of it.  The Weather Record reveals that on January 3, 2010, 2.6 inches of snow or ice pellets had accumulated in the 24 hour period preceding an unspecified time of observation,[3] 6 total inches of snow, ice pellets, hail or ice were present on the ground, and precipitation fell that day between 7:00 AM and 11:00 PM.  The temperature ranged between 14 and 18 degrees Fahrenheit.  No precipitation fell on January 4, which saw the temperature range between 16 and 29 degrees Fahrenheit, and 3 inches of snow, ice pellets, hail or ice remained present on the ground.  On January 5 the temperate ranged between 16 and 28 degrees, trace amounts[4] of snow or ice had accumulated in the 24 hour period preceding an unspecified time of observation, 2 inches of snow, ice pellets, hail

_____

indicated where in Danbury the data in the Form B-91 provided to the Court was amassed, or the distance of this weather station from FCI Danbury.  It is additionally unclear to the Court whether the second page of this Record is a distinct weather report submitted to the NWS by a different volunteer, as it contains slightly different data from the first page, and appears to be incomplete. Thus, as it appears that the parties reference only the first of this/these Record/s, and that the second Record appears to be incomplete, the Court will likewise reference only the first Weather Record.

[3]     The Weather Record notes the time of observation for both temperature and precipitation as "MID."  While it may be reasonable to assume that "MID" denotes 12:00 PM / noon, the Court is wary of making such an assumption, as this time would not follow the times at which the instructions for Form B-91 direct the observer to take record his observations.  The instructions for Form B-91 state that "Routine River and/or Rainfall observations should ALWAYS be taken in the MORNING, preferably at 7 a.m. . . . At climatological stations, however, precipitation should be measured at the same time the temperature reading[s] are made (preferably after 5 p.m.)."

[4]     The instructions for reading Form B-91 state that a "T" in the column at hand indicates "trace" amounts.

or ice remained on the ground, and precipitation fell between 8:00 and 9:00 PM. On January 6 and 7 no precipitation fell, no snow or ice had accumulated in the 24 hour period preceding the unspecified time of observation, and the temperature ranged between 19 and 30 degrees, and 22 and 38 degrees respectively.  Two inches of snow remained on the ground on January 6, and 1 inch remained on January 7.  Finally, on January 8, the day of Dominguez's fall, 1.7 inches of snow or ice pellets had accumulated in the 24 hour period preceding the unspecified time of observation, the temperature ranged from 17 to 34 degrees Fahrenheit, 2 total inches of snow, ice pellets, hail or ice were present on the ground, and precipitation fell that day between 4:00 AM and 3:00 PM, and again between 4:00 and 6:00 PM.  [Dkt. 48-10, Weather Report, p.2].

The pavement walkway area where Ms. Dominguez fell was maintained by employees of the federal Bureau of Prisons, which was responsible for snow and ice removal.  [Dkt. 48-2, D's 56(a)1 Stmnt. ¶7; Dkt. 52-2, MacGregor Depo. p.47 (15/21)].  Facility Manager MacGregor testified that if there was enough snow to warrant it his staff would clear the snow from the rear gate area near the UNICOR building with a snow plow.  [Dkt. 52-2, MacGregor Depo. pp.23, 28 (4, 7/21)].  Two FCI Danbury staff members who arrived at the Facility at 6:15 AM would "have their inmates come in at 6:15 with them and they would do a light like cleaning up, as far as like put some calcium down if they felt it was warranted;" if there

was more than a light snow, the staff members would call for the snow plow.[5]
[Dkt. 52-2, MacGregor Depo. pp.28-29  (7-8/21)].  FCI Danbury had the ability to
close certain areas due to snow or ice and to delay the inmates' work call until
the areas were cleared.  [Dkt. 52-2, MacGregor Depo. p.53 (18/21)].  Additionally,
UNICOR staff could call FCI Danbury staff to delay the inmates' work call if they
felt the area was not safe for walking.  [Dkt. 52-2, MacGregor Depo. p.89 (19/21)].
Work call was not delayed on the morning of January 8, 2010.  [Dkt. 52-2,
MacGregor Depo. p.90 (20/21)].  MacGregor recalled that snow had been cleared
around January 3, 2010, but could not recall whether it had snowed or whether
ice had formed between that date and January 8, 2010.  [Dkt. 57, MacGregor Depo.
p.92].  On January 8, 2010 MacGregor was informed that Ms. Dominguez had
fallen, but upon inspection of the rear gate area MacGregor "wasn't able to see
any ice or any buildup area to specify" where the Plaintiff had fallen.  [Dkt. 57,
MacGregor Depo. p.93].

III.    <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of
proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98,
106 (2d Cir.2010).  "In determining whether that burden has been met, the court is
required to resolve all ambiguities and credit all factual inferences that could be

---

**5**    MacGregor further testified that "[m]y staff would come in in the morning
and, like I said, it was their duty to check if the area was clear enough to have the
inmates go through and walk."  Dkt. 52-2, MacGregor Depo. p.89 (19/21)].

drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

**IV.** **Discussion**

The Defendant urges the Court to grant summary judgment in its favor on two grounds.  First, the Defendant claims that the Plaintiff cannot establish that the Defendant had a duty to clear the walkway at the time of Plaintiff's fall because there was a storm in progress, pursuant to Plaintiff's own testimony. Second, the Defendant alleges that it had neither actual nor constructive notice of the alleged pre-existing or accumulated ice or snow on the walkway such that it would have been aware of the defect for a sufficient length of time to have remedied it.  Dominguez counters that the United States is liable for her personal injuries because it was negligent in not clearing snow and ice from the walkway at FCI Danbury despite having constructive notice of the existence of snow and ice and despite having a duty to either clear the snow or ice or to delay the inmate work call until the area was cleared.  According to Dominguez, Connecticut's ongoing storm doctrine does not bar her negligence claim because an unusual circumstance exception applies: FCI Danbury chose not to delay the inmate work call time on the day in question, thus forcing the Plaintiff to walk through the rear gate area despite the existence of a dangerous condition.  The Court finds that genuine issues of material fact exist that preclude a grant of summary judgment.

Dominguez brings this negligence action pursuant to the FTCA, under which the federal government has waived its sovereign immunity where a government employee commits a tort "while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  "The applicable law to a claim

9

against the Government under the FTCA is the law that the state where the tortious incident took place would apply in like circumstances involving a private defendant." *Silverman v. U.S.*, No. CV 04-5647, 2008 WL 1827920, at *12 (2d Cir. Mar. 28, 2008) (quoting *Caban v. U.S.*, 728 F.2d 68, 72 (2d Cir. 1984)); *Davis v. U.S.*, 430 F. Supp. 2d 67, 73 (D. Conn. 2006) ("Under the FTCA the government's liability is determined by the application of the law of the place where the act or omission occurred").  Connecticut law applies to Dominguez's claims because it would apply if Dominguez had brought a negligence action against a private defendant.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Baptiste v. Better Val-U Supermarket, Inc.*, 262 Conn. 135, 138 (Conn. 2002) (internal quotation marks and citations omitted).  The existence of a duty is a question of law.  *Gordon v. Bridgeport Hous. Auth.*, 208 Conn. 161, 171 (Conn. 1988); *Dubuis v. U.S.*, 3:06CV01443 DJS, 2008 WL 410429, at *4 (D. Conn. Feb. 12, 2008).  "Only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." *Gordon*, 208 Conn. at 171.  The status of a person entering onto a possessor's land determines the duty owed by the possessor to such person: thus, an ascending degree of duty is owed to a trespasser, a licensee, and an invitee. *Considine v. City of Waterbury*, 279 Conn. 830, 859 (Conn. 2006).  Few courts have expounded on what duty of care is owed to an inmate.  The few courts that have considered the issue have treated inmates as invitees and thus subject to the highest duty of care.  *See, e.g.*, *Brye v. State*, CV065000745, 2012 WL 803438, at *5 (Conn. Super.

Ct. Feb. 17, 2012) ("The parties have also agreed that, despite the plaintiff's involuntary incarceration, he was a business invitee insofar as that term is legally applied in the State of Connecticut"); *Dubuis*, 2008 WL 410429, at *4 ("From what the court can discern, no Connecticut case has determined the entry status of a prisoner.  Thus, for purposes of deciding this motion, the court assumes that the Plaintiff was owed the highest duty of care, that of an invitee.").  Absent any firm precedent, the Court will consider Dominguez to be an invitee and thus accorded the highest duty of care.

"A possessor of land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe.... In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover."  *Considine*, 279 Conn. at 859 (internal quotation marks and citation omitted).  Thus, to prevail on her negligence claim, Dominguez must prove "(1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect and (3) that such defect had existed for such a length of time that the defendant should, in the exercise of reasonable care, have discovered it in time to remedy it."  *Martin v. Stop & Shop Supermarket Cos., Inc.*, 70 Conn. App. 250, 251 (Conn. App. Ct. 2002) (internal quotation marks and citations omitted); *Considine*, 279 Conn. at 870 ("in the context of a negligence action based on a defective condition on the defendant's premises, there could be no breach of the duty resting upon the defendants unless they knew of the defective condition or were chargeable with

notice of it.") (internal quotation marks and citations omitted).  To prevail, an

invitee must prove

> that the defendant either had actual notice of the
> presence of the specific unsafe condition which caused
> his injury or constructive notice of it.... The notice,
> whether actual or constructive, must be notice of the
> very defect which occasioned the injury and not merely
> of conditions naturally productive of that defect even
> though subsequently in fact producing it.... In the
> absence of allegations and proof of any facts that would
> give rise to an enhanced duty ... a defendant is held to
> the duty of protecting its business invitees from known,
> foreseeable dangers.

*Kelly v. Stop and Shop, Inc.*, 281 Conn. 768, 776 (Conn. 2007) (internal quotation

and grammatical marks omitted); *see also Fisher v. Big Y Foods, Inc.*, 298 Conn.

414, 423-39 (Conn. 2010) (quoting same); *James v. Valley-Shore Y.M.C.A., Inc.*,

125 Conn. App. 174, 179 (Conn. App. Ct. 2010) ("the plaintiff [is] required to prove

that the defendant had had actual or constructive notice of the *specific defect*

that caused the plaintiff's injuries.") (quoting *Riccio v. Harbour Village Condo.*

*Ass'n., Inc.*, 281 Conn. 160, 164 (Conn. 2007)); *Graham v. Kohl's Dept. Stores, Inc.*,

No. 3:04CV949(MRK), 2005 WL 2256603, at *1 (D. Conn. Sept. 8, 2005) ("relevant

case law in Connecticut places a heavy burden on a 'slip and fall' plaintiff to

demonstrate that a defendant had actual or constructive notice of the specific

defect that led to the accident and 'not merely of conditions naturally productive

of that defect even though subsequently in fact producing it.'") (citing *LaFaive v.*

*DiLoreto*, 2 Conn. App. 58, 60 (Conn. App. Ct. 1984)).

### a.  Duty of Care: Ongoing Storm / Storm in Progress Doctrine

The Defendant argues that it is entitled to summary judgment because it owed no duty to Plaintiff to clear the snow and/or ice from the rear gate area based on Ms. Dominguez's own testimony that there was a snow storm in progress at the time of her fall.  The Plaintiff counters that this action falls into the "unusual circumstances" exception to the storm in progress doctrine, and thus Defendant must be liable for Plaintiff's injuries.

Pursuant to Connecticut law, "in the absence of unusual circumstances, a property owner, in fulfilling the duty owed to invitees upon his property to exercise reasonable diligence in removing dangerous accumulations of snow and ice, may await the end of a storm and a reasonable time thereafter before removing ice and snow from outside walks and steps." *Kraus v. Newton*, 211 Conn. 191, 197-98 (Conn. 1989).  "In other words . . . the landowner's duty to remove ice and snow does not arise until after a reasonable period has passed following the conclusion of the storm." *Umsteadt v. G.R. Realty*, 123 Conn. App. 73, 83 (Conn. App. Ct. 2010) ("absent unusual circumstances, a landowner is allowed to await the end of a winter storm, and a reasonable time thereafter, before removing ice and snow deposited by that storm.").  The Connecticut Supreme Court has reasoned that "[t]o require a landlord or other inviter to keep walks and steps clear of dangerous accumulations of ice, sleet or snow or to spread sand or ashes while a storm continues is inexpedient and impractical." *Kraus*, 211 Conn. at 198.

The Plaintiff maintains that there was a storm in progress at the time of Plaintiff's fall, but that the unusual circumstances exception to the above rule

negates the insulation from liability that the pendency of such a storm would normally provide to the Defendant.  The Defendant, however, argues *both* that there was a storm in progress during the time of Plaintiff's fall, *and* contrarily that the Weather Record for January 8 indicates that not enough snow had fallen for the Defendant to have had notice of any dangerous condition in the rear gate area.

Both the Plaintiff and Defendant rely on Plaintiff's deposition testimony for the proposition that a storm was in progress at the time of her fall:

> Q:    Can you describe the - - your memory of the weather conditions on . . . the day you fell?
>
> A:    Oh, that day, the weather, it was snowing.  It had been snowing hard for a number of days.
>
> Q:    Is it your testimony that as you were walking to UNICOR on [the day you fell], that it was actually snowing?
>
> A:    Yes, because I was there for a while.  I couldn't even get up because this bone was over here.  And by the time they got me up, I had snow all over my head because it was snowing out.  It was snowing heavily.

[Dkt. 52-1, Dominguez Depo. p.16 (5/8)].

The Defendant claims that the Plaintiff's account is corroborated by the Weather Record for the month of January, which allegedly shows that on January 8, 2010 "1.7 inches of snow fell in Danbury, CT starting around 5 am and continuing until approximately 6 pm."  [Dkt. 48-1, D's MSJ p.9].  Plaintiff also cites to this Weather Record for the proposition that "the Defendant was on notice that it was snowing at the time that Plaintiff had to report to work."  [Dkt. 52, P's 56(a)2

**14**

Stmnt. ¶4].  It is unclear however, whether this Weather Record supports the parties' interpretations of it.  Specifically, the Court cannot conclude that 1.7 inches of snow fell between the hours of 5 AM and 6 PM on January 8, 2010.  The Weather Record indicates, rather, that 1.7 inches of snow or ice pellets had accumulated *in the 24 hour period preceding the unspecified time of the recorder's observation*, the temperature on that day ranged from 17 to 34 degrees Fahrenheit, 2 total inches of snow, ice pellets, hail or ice were present on the ground at the unspecified time of observation, and precipitation fell that day between 4:00 AM and 3:00 PM, and again between 4:00 PM and 6:00 PM.  [Dkt. 48-10, Weather Report, p.2].  As the Court noted previously, the Weather Record indicates the time of observation to have been "MID" but does not specify an exact time.  If the Court reads "MID" as 12:00 PM, or noon, then 1.7 inches of snow or ice pellets would have fallen between 12:00 PM on January 7, 2010 and 12:00 PM on January 8.  Because the Weather Record indicates that no precipitation fell on January 7, and it also indicates that precipitation began falling at 4:00 AM on January 8, the Court could make the reasonable assumption that 1.7 inches of snow or ice had fallen between 4:00 AM and 7:30 AM on January 8, when the Plaintiff walked to work, thus supporting the proposition that a storm was in progress at the time of Plaintiff's fall.  However, if the Court credits the instructions for completing Form B-91, which state that "Routine River and/or Rainfall observations should ALWAYS be taken in the MORNING, preferably at 7 a.m. . . . At climatological stations, however, precipitation should be measured at

15

the same time the temperature reading[s] are made (preferably after 5 p.m.),"[6] then the time of observation could have been 7:00 AM or after 5:00 PM, thus altering the conclusions that could be drawn as to the amount of snowfall at 7:30 AM on January 8. Without more information as to the time of observation, this Court cannot conclude that 1.7 inches of snow or ice had fallen by the time of Plaintiff's fall at 7:30 AM on January 8, 2010.

Moreover, regardless of whether a winter storm was ongoing at the time of Plaintiff's fall, there still remains a genuine issue of material fact as to whether the Plaintiff fell on snow or ice that had accumulated as a result of this storm, or whether she slipped and fell on ice that had accumulated *prior* to the date of her fall, making the Defendant potentially liable for her injuries. *See, e.g., Kraus v. Newton*, 211 Conn. 191, 198 (Conn. 1989) ("Our decision, however, does not foreclose submission to the jury, on a proper evidentiary foundation, of the factual determinations of whether a storm has ended or whether a plaintiff's injury has resulted from new ice or old ice when the effects of separate storms begin to converge."). The Weather Record on which both parties rely indicates that two total inches of snow, ice pellets, hail or ice were present on the ground at an unspecified time of observation on January 8, 2010, and precipitation fell that day between 4:00 AM and 3:00 PM, and again between 4:00 PM and 6:00 PM. [Dkt.

---

[6]    The Court notes that the Weather Record indicates "Danbury" in the "STATION (climatological)" box on the Form B-91 submitted as evidence in this case. If this means that this Weather Record was made at a climatological station, then perhaps it is correct to assume that the precipitation reading should have been made after 5:00 PM. Without more information, though, this Court will not so assume.

48-10, Weather Report, p.2].  On January 6 two total inches of ice and/or snow were present on the ground at the time of the recorder's observation, and on 7 one total inch of snow was present.  No precipitation fell on either January 6 or 7, but the temperature ranged between 19 and 30 degrees, and 22 and 38 degrees respectively.  [Dkt. 48-10, Weather Report, p.2].  This range in temperature and decline in the total snow and/or ice present on the ground indicates that some melting could have occurred on January 7, and such melted ice or snow could have refrozen by January 8, when temperatures dropped back to between 17 and 34 degrees Fahrenheit.  Further, the Plaintiff testified that, on the morning of her fall,

> Everyone was talking about the fact that [the rear gate area] hadn't been cleared.  It was slippery.  All of the others were saying, Oh, you know, look, it's slippery, there is a lot of ice, it hasn't been cleared. . . . No, [the pavement] wasn't cleared.  And it was - - it had been snowing for days.  Days.

[Dkt. 52-1, Dominguez Depo. pp.17-18 (6-7/8)].  This testimony, read in conjunction with the Weather Record, supports the Plaintiff's contention that she *may* have slipped on ice and/or snow that existed on the rear walk area of FCI Danbury *prior to* the time of her fall and was not necessarily a result of the snow she claims was falling contemporaneously with her walk to UNICOR.  Without more evidence in the record, the Court simply cannot make this determination and this issue remains extant for trial.  *See Berlinger v. Kudej*, 120 Conn. App. 432, 437 (Conn. App. Ct. 2010) (reversing grant of summary judgment because genuine issue of material fact existed as to whether plaintiff slipped on pre-

17

existing ice or whether effects of ongoing storm caused his fall); *DeSimone v. New Haven Hous. Auth.*, CV045000155S, 2006 WL 3411041 (Conn. Super. Ct. Nov. 13, 2006) (factual issue as to whether preexisting accumulation of ice or precipitation from ongoing storm caused plaintiff's fall existed, thus precluding summary judgment in favor of defendant).

Lastly, and seemingly contrarily to the Defendant's argument that a winter storm was ongoing at the time of Plaintiff's fall, the Defendant also argues that no snow had fallen or accumulated in the four days leading up to January 8, "only 1.7 total inches of snow accumulated during a 13 hours period" on January 8, and thus "because 1.7 inches of snow fell within a 13 hour time period, between approximately 5 a.m. and 6 p.m., a negligible amount of snow could have fallen" by the time of Plaintiff's fall, thereby providing the Defendant with no notice of any dangerous condition.  [Dkt. 48-1, D's MSJ p.11].  *See infra,* part c., Notice. Although the Court believes the Defendant has incorrectly interpreted the Weather Record, the Defendant has affirmatively argued *both* that too little snow had fallen by the time of Plaintiff's fall to have provided notice to any FCI Danbury employee that a dangerous condition existed, *and* that enough snow was falling at 7:30 AM that the storm in progress doctrine must shield the Defendant from liability in this case.  These potentially contrary positions support the Court's conclusion that several genuine issues of material fact exist such that summary judgment is improper.

In sum, the contradictory evidence provided by both parties denotes a genuine issue of material fact as to whether a winter storm was in progress at the

**18**

time of Plaintiff's fall, and also whether the Plaintiff slipped on ice or snow that had accumulated as a result of some ongoing winter storm, or on ice or snow deposited by an earlier weather event and subsequently not cleared by the Defendant.

### b. Unusual Circumstances

Although it is unnecessary to address in light of the predicate issue of material fact as to whether there was an ongoing storm on January 8, 2010, the Court will briefly address whether the unusual circumstances exception to the ongoing storm / storm in progress doctrine should apply in this case.  Based on the scant and contrary precedent available interpreting the term "unusual circumstances," the question of the unusual circumstances exception remains extant for trial, if the evidence at trial proves that a storm was in progress at the time of Plaintiff's fall.

Although the Plaintiff contends that there is no appellate authority explaining the phrase "unusual circumstances," the Connecticut Appellate Court has held that, in consideration of whether "unusual circumstances" exist, the status of the defendant may not be considered.  In *Sinert v. Olympia & York Dev. Co.* the Appellate Court ruled that, in a negligence case where the plaintiff allegedly slipped and fell on ice in an outdoor area as she was leaving her workplace during a winter storm, a jury instruction that required the jury to consider in determining whether unusual circumstances existed "the location of the premises, the use of the premises, the day of the week and the time of day"

was improper, "because it takes into consideration the status of the defendants as owners and maintainers of a commercial building in determining the duty owed to a plaintiff."  38 Conn. App. 844, 849 (Conn. App. Ct. 1995).  The Appellate Court further reasoned that

> The status of the defendant has never been relevant in determining the duty owed a person injured on that defendant's premises.  The trial court's assessment of unusual circumstances in this case would result in a heightened duty of care for some landowners as opposed to others.  The standard of care as explicated in Connecticut cases is based on the status of the plaintiff [as a trespasser, licensee, or invitee], not the defendant.  Unusual circumstances, therefore, do not include those factors that define the status of the defendant.  *Kraus* makes it clear that, absent unusual circumstances, the only factors to be considered are whether a storm was ongoing at the time of the accident and the plaintiff's status as an invitee.

*Sinert*, 38 Conn. App. at 849-50.  Three years after the holding in *Sinert*, the Connecticut Appellate Court clarified that *Sinert* "stands for the limited proposition that the defendant's status as a commercial property owner does not constitute an unusual circumstance within the decisional parameters of *Kraus*." *Cooks v. O'Brien Properties, Inc.*, 48 Conn. App. 339, 346 (Conn. App. Ct. 1998). The *Cooks* court further held that, where a tenant slipped and fell on uncleared outdoor apartment building steps leading to a plowed driveway during a winter storm, "the trial court properly instructed the jury on the law of *Kraus* including the unusual circumstances exception that would permit the jury to consider the evidence presented with respect to the changeover in precipitation and the availability of alternative means of egress from the defendant's property in

determining whether such unusual  circumstances existed on the day of the

plaintiff's accident so as to impose on the defendant the duty to remove the snow

and ice from the steps prior to 9 a.m."  *Id*. at 346-47.  No further appellate

precedent exists as to the meaning of the term "unusual circumstances."

Here, the Plaintiff urges the Court that the facts that FCI Danbury did not

delay the start of her work day at UNICOR and that the Plaintiff and other inmates

had to report to work at UNICOR on the morning of January 8 constitute "unusual

circumstances" such that the storm in progress doctrine should not insulate the

Defendant from liability.  The Plaintiff relies on the Connecticut Superior Court's

holding in *Hickok v. Dubray*, in which the court declined to grant summary

judgment where the plaintiff employee slipped and fell in her employer's parking

lot during an ongoing storm as she was attempting to move her car in the middle

of a double shift in anticipation of the lot being plowed.  LLICV096001069S, 51

Conn. L. Rptr. 461, 2011 WL 1168556 (Conn. Super. Ct. Feb. 28, 2011).  In *Hickok*,

the plaintiff's employer required her to move her car during a snow storm, a point

on which the court seized and which Ms. Dominguez claims is analogous to her

situation as an inmate:

> Here, Dubray [a company providing snow removal to
> plaintiff's employer] knew that double-shift employees
> would be required by [the employer] to walk out to their
> cars during a snow storm, to move them to another lot,
> and then to walk back into the building.  Dubray knew or
> should have known that these employees would be
> subject to the risks of walking in a parking lot in the
> midst of a snowstorm.  This creates a factual issue
> about whether these facts present an "unusual
> circumstance" which would create a duty on the part of

> Dubray.  Only the jury can decide this factual issue. For
> this reason, the motion for summary judgment must be
> denied.

2011 WL 1168556, at *2.

Connecticut precedent on the unusual circumstances exception, though, is anything but clear.  Although *Hickok* allowed the unusual circumstances question to proceed to the jury where the plaintiff's employer required her to walk to her car during a snowstorm and in the middle of her work shift, several courts have ruled that no unusual circumstances existed where plaintiffs have slipped and fallen upon exiting their places of employment.  *See Valagic v. Inline Plastics Corp.*, CV044000841, 2006 WL 1075147 (Conn. Super. Ct. Apr. 4, 2006) (no unusual circumstances existed where plaintiff slipped and fell outside her place of work); *Cowes v. Fusco Harbour Ass'n*, CV030473470, 2005 WL 2981769 (Conn. Super. Ct. Oct. 19, 2005) (no unusual circumstances existed where plaintiff slipped and fell outside his place of work, and where he claimed that the fact that it was a work day, he slipped at the end of the work day, and the office building outside which he slipped had thousands of tenants constituted unusual circumstances); *Uhelsky v. One Research Drive Associates, Inc.*, CV010075247S, 2002 WL 31928610 (Conn. Super. Ct. Dec. 20, 2002) (no unusual circumstances where "the plaintiff fell in an unplowed area of the parking lot of her place of employment at the end of her work day during an ongoing storm").  *See also Coleman v. Copps Hill Plaza Shopping Associates*, CV96 0326258, 1999 WL 369961 (Conn. Super. Ct. May 25, 1999) (granting summary judgment in favor of defendant where plaintiff was a business invitee; "The fact that the property on which the fall occurred is

commercial, rather than residential, is therefore insufficient to overcome the *Kraus v. Newton* rule, and cannot serve as a basis for denying the defendant's motion for summary judgment.  Furthermore, whether the activities during the storm induced the plaintiff to enter the property, alters neither the status of the plaintiff, nor the duty of care owed by the defendant.").

Additionally, the federal government owes a duty of reasonable care to safeguard the security of prisoners under its control.  *See United States v. Muniz*, 374 U.S. 150, 164-65 (1963) (duty of care owed by the Bureau of Prisons to federal prisoners is mandated by 18 U.S.C. § 4042); *Jones v. United States*, 534 F.2d 53, 54 (5th Cir.), Cert. denied, 429 U.S. 978, 97 (1976).  This duty is imposed by statute and the Constitution.  *See* 18 U.S.C. § 4042; *Farmer v. Brennan*, 511 U.S. 825 (1994) (prison officials are required to provide humane conditions of confinement); *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974) (prisoners continue to enjoy Constitutional protections while incarcerated); *Burgin v. Henderson*, 536 F.2d 501, 502 (2d Cir.1976) ("it is now common ground that a convicted defendant still has constitutional rights when the prison gate closes behind him").  The Bureau of Prisons must "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise."  18 U.S.C. § 4042(a)(2).  Thus, the Defendant had a constitutional and statutory duty to maintain the prison facility in a safe condition.

Here, the Plaintiff argues that her march to work on the morning of January 8, 2010 was both unsafe and mandatory, thus requiring FCI Danbury to clear the

premises to ensure her safety on her walk to work.  Although the weight of the above precedent appears to indicate that the unusual circumstances of being an employer and knowing that employees must arrive at work at a certain hour does not impose a duty to clear the outside areas of an employer's premises during a snowstorm, here Ms. Dominguez's status as an inmate *may* create an unusual circumstance akin to that found in *Hickok*.  Without more evidence in the record to support either the Defendant's or the Plaintiff's position on the matter, this question remains extant for trial.

      **c.  <u>Notice</u>**

The Defendant further alleges that it is entitled to summary judgment because the Plaintiff has presented no evidence that the Defendant had either actual or constructive notice of the alleged pre-existing or accumulated ice or snow on the walkway such that Defendant would have known of the defect for a sufficient length of time to have remedied it.  Dominguez counters that the Defendant had constructive notice of the existence of snow and ice on the walkway.  The Court concludes that Plaintiff has provided sufficient circumstantial evidence of constructive notice such that genuine issues of material fact exist as to whether Defendant should have known of the allegedly dangerous condition on the walkway, thus precluding a grant of summary judgment.

"The controlling question in deciding whether the defendant[] had constructive notice of the defective condition is whether the condition existed for

such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it.  What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case."  *Riccio*, 281 Conn. at 163-64 (internal quotation marks and citations omitted); *see also Kelly*, 281 Conn. at 777 (same); *James*, 125 Conn. App. at 179 (same).  "The nature of the business and the location of the foreign substance would be factors in this determination. . . To a considerable degree each case must be decided on its own circumstances. Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant." *Kelly*, 281 Conn. at 777 (internal citations and quotation marks omitted).  "To establish constructive notice, [the plaintiff] must adduce some evidence, either direct or circumstantial, that establishes the length of time the defect was present."  *Navarro v. Kohl's Department Stores, Inc.*, No. 3:05CV00843 (DJS), 2007 WL 735787, at *4 (Conn. Super. Ct. Mar. 8, 2007).  Furthermore, "[a]n inference [of constructive notice] must have some definite basis in the facts . . . and the conclusion based on it must not be the result of speculation and conjecture." *Gulycz v. Stop and Shop Cos., Inc.*, 29 Conn. App. 519, 522 (Conn. App. Ct. 1992).

Here, as discussed prior, Plaintiff has testified that on the morning of her fall

> Everyone was talking about the fact that [the rear gate area] hadn't been cleared.  It was slippery.  All of the others were saying, Oh, you know, look, it's slippery, there is a lot of ice, it hasn't been cleared. . . . No, [the

pavement] wasn't cleared.  And it was - - it had been
snowing for days.  Days.

[Dkt. 52-1, Dominguez Depo. pp.17-18 (6-7/8)].  Further, the Weather Record
indicates that the temperatures on January 6, 7, and 8 fluctuated below and above
the freezing point such the snow and ice existing on the ground could have
melted and refrozen.  *See supra* part a., Duty of Care: Ongoing Storm / Storm in
Progress Doctrine.  Bruce MacGregor testified that it was the usual practice of
two FCI Danbury employees to inspect the areas outside of the UNICOR building
around 6:15 each morning, at which point the employees would decide whether
the snow or ice accumulation merited either no action, the application of calcium
to light buildups of snow or ice, or the use of a snow plow truck to clear heavier
snow or ice loads.  Therefore, drawing all inferences in favor of the Plaintiff, it is
possible for a trier of fact to conclude that ice existed on the walkway prior to
7:30 AM on January 8, 2010 and, based on the usual practices at FCI Danbury, the
two employees reviewing the area around 6:15 AM should have known of any
such buildup of ice.

Further, although the Defendant points to the deposition testimony of
Facility Manager Bruce MacGregor to support its claim that "FCI Danbury has no
record of any complaints or reports of ice on the pavement for January 8, 2010 or
prior to that date," the evidence provided to the Court does not support such an
inference.  [Dkt. 48-1, D's MSJ p.11].  Instead, Bruce MacGregor has only testified
that he "had no reports of anybody [other than the Plaintiff] slipping and falling"
on January 8, 2010.  No evidence in the record, however, supports the assertion

that FCI Danbury has no record and MacGregor received no other complaints of ice on the pavement on January 8 or prior to that date.

Thus, reviewing the provided evidence in its totality, the Court concludes that the Plaintiff has provided enough circumstantial evidence of constructive notice such that a material issue of fact remains.  *See Berlinger v. Kudej*, *DeSimone v. New Haven Hous. Auth.*, *supra* part a., Duty of Care: Ongoing Storm / Storm in Progress Doctrine.

## V.   Jurisdiction

Although the parties have not addressed the issue of jurisdiction, the Court finds that it lacks jurisdiction over this matter altogether.  If Dominguez were the non-incarcerated employee of a private employer / defendant, her sole recourse pursuant to Connecticut law for injuries arising out of and in the course of her employment – such those alleged here – would be her entitlement to workers' compensation.  Conn. Gen. Stat. § 31-284.  Likewise, if Dominguez were a federal employee, she would be subject to the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8101 *et seq.*, which provides, in relevant part, that:

> [t]he United States shall pay compensation as specified by this subchapter for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty . . .

5 U.S.C. § 8102(a).  Workers' compensation under the FECA is a federal employee's exclusive remedy for personal injury sustained in the performance of his duties.  5 U.S.C. § 8116(c) ("The liability of the United States or an

instrumentality thereof ... with respect to injury or death of an employee is exclusive and instead of all other liability ..."); *see also Votteler v. United States*, 904 F.2d 128, 130 (2d Cir. 1990) ("FECA is the exclusive remedy for work-related injuries sustained by federal employees").  Further, "[b]ecause the FECA is an exclusive remedy … it deprives federal courts of subject-matter jurisdiction to adjudicate claims brought under the FTCA for workplace injuries that are covered by the FECA."  *Mathirampuzha v. Potter*, 548 F.3d 70, 81 (2d Cir. 2008).

Moreover, the FECA provides that "[t]he Secretary of Labor shall administer, and decide *all questions* arising under, [the FECA]."  5 U.S.C. § 8145 (emphasis added).  As to who decides whether a claim is within the scope of FECA coverage: the Secretary of Labor or the federal district court asked to adjudicate a claim under the FTCA, the Second Circuit has taken the position of the majority of the Circuits to have addressed the issue:

> where there is a substantial question of FECA coverage-indeed, unless it is certain that the FECA does not cover the type of claim at issue-the district court may not entertain the FTCA claim. . . . If there is a substantial question of FECA coverage, only the Secretary of Labor or her delegate may decide whether the FECA applies.  If the Secretary determines that the plaintiff's claim is fundamentally outside the scope of the FECA, then the claim may proceed under the FTCA in district court. Conversely, the courts have no jurisdiction over FTCA claims where the Secretary determines that FECA applies.

*Mathirampuzha*, 548 F.3d at 81-82 (citations and internal quotation marks omitted; collecting Circuit cases; holding that Secretary must decide whether emotional

distress claim fell under the FECA); *see also Gill v. United States*, 641 F.2d 195, 197 (5th Cir. 1981) ("district courts may not entertain FTCA suits if there is even a substantial question as to whether the plaintiff's injury occurred in the performance of his federal employment").

Federal prison inmates too are constricted by a statutory compensation scheme for injuries sustained in the course of prison work programs.  18 U.S.C. § 4126 provides that:

> All moneys under the control of Federal Prison Industries, or received from the sale of the products or by-products of such Industries, or for the services of federal prisoners, shall be deposited or covered into the Treasury of the United States to the credit of the Prison Industries Fund and withdrawn therefrom only pursuant to accountable warrants or certificates of settlement issued by the Government Accountability Office.

18 U.S.C. § 4126(a).  The Federal Prison Industries are:

> authorized to employ the fund . . . in paying, under rules and regulations promulgated by the Attorney General, compensation to inmates employed in any industry, or performing outstanding services in institutional operations, and compensation to inmates or their dependents for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution in which the inmates are confined.

18 U.S.C. § 4126(c)(4).

The prisoner compensation program pursuant to 18 U.S.C. § 4126 provides the exclusive means of redress against the Government for prisoners who sustain injuries in the course of prison employment.  *United States v. Demko*, 385

U.S. 149, 152 (1966) (compensation program is sufficiently comprehensive to be exclusive means of redress to prisoners; "that law, as shown by its regulations, its coverage and the amount of its payments to the injured and their dependents, compares favorably with compensation laws all over the country"); *Granade v. United States*, 356 F.2d 837, 842 (2d Cir. 1966) (prisoner could not bring suit under the FTCA for injuries sustained in course of prison employment where 18 U.S.C. § 4126 provided exclusive scheme for compensation); 28 C.F.R. §301.319 ("Inmates who are subject to the provisions of these Inmate Accident Compensation regulations are barred from recovery under the Federal Tort Claims Act"); *Saladino v. Fed. Prison Indus.*, 404 F. Supp. 1054, 1056 (D. Conn. 1975) ("The remedy under Sec. 4126 is exclusive and any attempt by an inmate to recover damages in an amount greater than the award of compensation established by the statute and regulations is barred").  Indeed, "an examination of the regulations makes it quite clear that an award of compensation under Section 4126 is not discretionary but is mandatory as to any claim that comes within their terms."[7] *Granade*, 356 F.2d at 843.

     It appears that this Court thus lacks jurisdiction to hear Dominguez's claim as her sole recourse is compensation pursuant to 18 U.S.C. § 4126 and the regulations promulgated thereunder.  *See Dunn v. U.S. Fed. Bureau of Prisons*, 3:03CV1928(JBA), 2006 WL 695805 (D. Conn. Mar. 20, 2006) (court lacked jurisdiction over FTCA claim of inmate at FCI Danbury who tripped and fell while exiting her assigned work area at UNICOR, and who had applied for and received

---

[7]      These regulations may be found at 28 C.F.R.§ 301, *et seq.*

compensation pursuant to 28 U.S.C. § 4126); *Moore v. United States*, 85-CV-1151, 1988 WL 70025 (N.D.N.Y. June 30, 1988) (inmate's FTCA claims were barred for lack of jurisdiction where prison Safety Committee determined injury sustained when inmate slipped while walking on an icy pathway between his assigned workplace and another prison facility was work-related and thus compensable under 28 U.S.C. § 4126).  Federal courts are courts of limited jurisdiction and may not hear claims over which they have no subject matter jurisdiction.  *Mims v. Arrow Fin. Servs, LLC*, 132 S. Ct. 740, 747 (2012); U.S. CONST. art. III, § 2*; see also Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994) (federal courts "possess only that power authorized by Constitution and statute").  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

## VI.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED.  However, in light of the Court's lack of jurisdiction, the case is DISMISSED without prejudice to the Plaintiff filing a motion to vacate the dismissal, accompanied by a memorandum of law in support of the motion within 21 days of this order, or by August 30, 2013, stating why the Court has jurisdiction over her FTCA claim in light of the statutory compensation scheme available to federal inmates.  Failure to file a motion and supporting memorandum of law on or prior to August 30, 2013 may result in dismissal of this action in its entirety with prejudice to the Plaintiff's ability to reopen.

**IT IS SO ORDERED.**


_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: August 9, 2013**